UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————————————— )
                                                    )
COMMONWEALTH OF THE                                 )
NORTHERN MARIANA ISLANDS,                           )
                                                    )
            Plaintiff,                              )
                                                    )
      v.                                            )      Civil Action No. 08-1572 (PLF)
                                                    )
UNITED STATES OF AMERICA, *et al.*,                 )
                                                    )
            Defendants.                             )
———————————————————————— )

OPINION

        This is a case about the United States' authority to legislate for the

Commonwealth of the Northern Mariana Islands ("CNMI" or "the Commonwealth") – a group

of Micronesian islands that enjoys a unique political relationship with the United States.  The

CNMI, joined by *amicus curiae* CNMI Descent for Self-Government and Indigenous Rights

("CNMI Descent"), argues that the recent enactment of legislation applying federal immigration

laws to the CNMI violates the agreement governing the relationship between the CNMI and the

United States.  The CNMI therefore has asked the Court to preliminarily enjoin implementation

of certain provisions of that legislation, scheduled to take effect on November 28, 2009, and to

hold unlawful and permanently enjoin those same provisions.

        By its amended complaint and an accompanying motion, filed on November 2,

2009, the CNMI has also asked the Court to preliminarily enjoin the regulations implementing

the legislation that were issued by the Department of Homeland Security ("DHS") on October

27, 2009, and also are scheduled to take effect on November 27, 2009.  Plaintiff asserts that the

issuance of these regulations without notice and an opportunity to comment violates the requirements of the Administrative Procedure Act.  The Court will address that contention in a separate Opinion and Order to be issued later today.

Defendants, the United States, the Department of Homeland Security, DHS Secretary Janet Napolitano, the Department of Labor, and Labor Secretary Hilda Solis (collectively, "the defendants"), contend that the CNMI lacks standing to pursue its claims; that the CNMI's claims are not ripe; that this suit is not authorized under CNMI law; and that the CNMI has failed to state a claim upon which relief can be granted because the legislation at issue is lawful.  They therefore filed a motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure — which the Court has treated as a motion to dismiss Counts I and II of the recently-filed amended complaint — and asked the Court to deny as moot the CNMI's first motion for a preliminary injunction.  Because the Court agrees with the defendants that plaintiff has failed to state a claim, the Court issued an Order on November 23, 2009, dismissing Counts I and II of the amended complaint and denying plaintiff's first motion for a preliminary injunction.  This Opinion explains the reasoning underlying that Order. [1]

---

[1]    The papers submitted in connection with this matter include: the CNMI's amended complaint ("Compl."); CNMI's Motion for a Preliminary Injunction ("P.I. Mot."); Defendants' Opposition to CNMI's Motion for a Preliminary Injunction ("P.I. Opp."); CNMI's Reply in Support of its Motion for a Preliminary Injunction ("P.I. Reply"); Defendants' Motion to Dismiss ("Mot. Dismiss"); CNMI's Opposition to Defendants' Motion to Dismiss ("Mot. Dismiss Opp."); Substituted Reply in Support of Defendants' Motion to Dismiss ("Mot. Dismiss Reply"); Brief of *Amicus Curiae* CNMI Descent in Support of CNMI ("*Amicus* Brief"); Defendants' Supplemental Brief in Response to the Court's February 4, 2009 Order ("Defs. Supp."); CNMI's Supplemental Brief in Response to the Court's February 4, 2009 Order ("CNMI Supp."); Brief of *Amicus Curiae* CNMI Descent in Response to the Court's February 4, 2009 Order ("*Amicus* Supp."); Plaintiff's Supplemental Memorandum in Support of Motion for a Preliminary Injunction to Address Effect of Issuance of Regulations ("CNMI Supp. Mem."); and Defendants' Amended Response to Plaintiff's Supplemental Memorandum filed October 30, 2009 in Support of Plaintiff's Motion for a Preliminary Injunction ("Defs. Amended Resp.").

The Court's Opinion proceeds as follows.  First, the Court provides some necessary background information about the CNMI; the agreement, known as the Covenant, governing relations between the CNMI and the United States; and the legislation at issue in this case.  The Court next addresses the defendants' arguments in favor of dismissing this case for lack of subject matter jurisdiction.  Contrary to the defendants' views, the Court concludes that the CNMI has standing to pursue its claims; that its claims are ripe for review; and that this suit is authorized under CNMI law.  On the merits of the case, the Court first examines the terms of the Covenant and concludes that the Covenant unambiguously confers upon Congress the authority to enact the challenged legislation.  It then explains that, even if the Covenant were not clear on this point, the CNRA would still be a valid exercise of congressional authority under the Covenant because it survives the balancing test articulated by the Ninth Circuit in United States ex rel Richards v. Guerrero, 4 F.3d 749 (9th Cir. 1993).  In light of those conclusions, the Court finds that the CNMI has failed to state a claim for relief under the Covenant.

## I.  BACKGROUND

"The Northern Mariana Islands are a group of 14 islands in the western Pacific Ocean, lying just north of Guam, 5,500 miles from the U.S. mainland."  COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS: MANAGING POTENTIAL ECONOMIC IMPACT OF APPLYING U.S. IMMIGRATION LAW REQUIRES COORDINATED FEDERAL DECISIONS AND ADDITIONAL DATA at 8 (2008) ("GAO Report").[2]  The CNMI "has a total land area of approximately 180 square miles,"

---

[2]      The Court refers to the GAO Report throughout this Opinion.  It need not convert the defendants' motion to dismiss to a motion for summary judgment as a result, however, because the report is incorporated in the CNMI's complaint, see, e.g., Compl. ¶¶ 4, 7, and is central to the CNMI's claims.  See, e.g., Vanover v. Hantman, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), aff'd, 38 Fed. App'x. 4 (D.C. Cir. 2002).

Amended Complaint ¶ 24 ("Compl."), and is populated by about 60,000 individuals.  <u>Id.</u>  "Only

30,000 members of the CNMI's present population are U.S. citizens.  Foreign workers [allowed

to live and work in the CNMI by the CNMI government] and their families number roughly

24,000.  The remainder of the population is made up of non-citizens with permanent resident

status."  <u>Id.</u>

　　　　　The United States Court of Appeals for the Ninth Circuit has described the

pertinent political history of the CNMI as follows:

> 　　　　　For over three hundred years, the Northern Marianas and
> Guam were Spanish colonies sharing common languages, religion,
> and culture.  The political ties between the Northern Marianas and
> Guam were eventually broken by the Spanish-American War of
> 1898, with Guam becoming a territory of the United States and the
> Northern Marianas coming under German, and then Japanese, rule.
>
> 　　　　　After World War II, the United Nations established the
> Trust Territory of the Pacific Islands encompassing most of the
> islands of Micronesia, among them the Northern Mariana Islands,
> to be administered by the United States pursuant to a Trusteeship
> Agreement with the United Nations Security Council.  <u>See</u>
> Trusteeship Agreement for the Former Japanese Mandated Islands,
> 61 Stat. 3301, T.I.A.S. No. 1665, art. 3.  The Trusteeship
> Agreement imposed on the United States an obligation to "promote
> the development of the inhabitants of the trust territory toward self-
> government or independence."  <u>Id.</u> art. 6, § 1.
>
> 　　　　　In October 1969, the United States entered into negotiations
> with the Congress of Micronesia to determine Micronesia's future
> political status.  Efforts to establish a unified Micronesian state,
> however, were undermined by a lack of consensus about the
> region's political future. . . .  The Congress of Micronesia, for
> instance, was in favor of establishing a freely associated state,
> independent of the United States.  The Northern Mariana Islands,
> on the other hand, sought a close and permanent association with
> the United States.  Proximity and a shared history with Guam gave
> the people of the Northern Mariana Islands some familiarity with
> the United States, making it the least alien major power with whom
> negotiations might be initiated.  Representatives of the Northern
> Marianas thus pursued separate political status talks with the United
> States over a period of years.

4

> In 1972, the United States entered into formal negotiations with the Northern Marianas. . . .
>
> Negotiations between the United States and the Northern Marianas culminated on February 15, 1975 with the signing of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America. [See Pub. L. No. 94-241, 90 Stat. 263 (1976) (the "Covenant").]  The Covenant was unanimously endorsed by the NMI legislature, approved by 78.8% of NMI plebiscite voters, and enacted into law by Congress.  Joint Resolution of March 24, 1976, Pub. L. No. 94-241, 90 Stat. 263, reprinted in 48 U.S.C. § 1681 note.  The Covenant was implemented in three phases between March 24, 1976 and November 3, 1986.  Covenant § 1003.  On November 3, 1986, with the Covenant in full effect, the United States terminated the Trusteeship Agreement with respect to the CNMI by Presidential Proclamation. . . .

United States ex rel. Richards v. De Leon Guerrero, 4 F.3d at 751 (footnote omitted).

For several decades after the approval of the Covenant by the United States and the CNMI, federal immigration laws did not apply to the Commonwealth.  Left to determine its own immigration policies, the CNMI, shortly after its constitutional government took office in 1978, decided to take an approach to immigration that would foster economic development.  See Compl. ¶¶ 39-40.  Having concluded that various factors would make it difficult to attract workers and investors from the United States, the CNMI implemented an immigration regime designed to attract large numbers of foreign workers (i.e., workers who are not United States citizens or lawful permanent residents) and foreign investors.  The key feature of that regime was a program under which nonimmigrant foreign workers – most from China, Japan, Korea and the Philippines – were allowed to live and work in the CNMI subject to temporary, renewable work permits issued by the local CNMI government.  See GAO Report at 17; see also Compl. ¶ 41.  "To attract workers to the CNMI's remote location, [foreign workers] had permission to enter the

5

Commonwealth for an indefinite period, and they could remain (or depart or re-enter) so long as they remained employed and did not violate federal or local laws."  Compl. ¶ 41.

This program allowed the CNMI to increase the size of its work force substantially, see GAO Report at 13, which in turn allowed the CNMI to enjoy remarkable economic growth during the 1980s and 1990s.  See Compl. ¶¶ 42-43.  In particular, the CNMI's garment-manufacturing and tourism industries flourished during this period.  Id. at ¶ 43.[3]  At the same time, however, the CNMI's economy became heavily dependent on foreign labor.  Indeed, foreign workers now account for "two-thirds of the CNMI's working population," Compl. ¶ 2, and constitute the majority of employees in the critical garment-manufacturing and tourism industries.  Id. at ¶¶ 42-43.  According to the CNMI, its "U.S. citizen workforce is too small to supply the needs of local businesses or sustain the CNMI's future economic development."  CNMI Supp. at 5.  Thus, "[r]etention of its foreign workers is . . . essential to the CNMI's continued economic viability."  Id.  Moreover, foreign workers "are deeply enmeshed in the Commonwealth's economy and society[.]" Compl. ¶ 58.  Thousands of such workers have lived in the CNMI for years, and some "have children born in the CNMI, who [therefore] are citizens of the United States."  Id.  Thus, in the CNMI's view, foreign workers not only "form the backbone of the Commonwealth's economy"; they are also "an essential component of [its] community."  Id.

It was against this backdrop that Congress enacted Title VII of the Consolidated Natural Resources Act of 2008 ("CNRA"), see Pub. L. No. 110-229, 122 Stat. 754, 853 (2008),

---

[3]        These industries have suffered recently due to unforeseen developments in international trade.  See GAO Report at 10; see also Compl.  ¶¶ 44-45.  As a result, the CNMI "has descended into an economic depression of substantial proportions," with tax revenues declining by approximately 35% between 2005 and 2007.  Compl. ¶ 46.

"[i]n recognition of the need to ensure uniform adherence to long-standing fundamental immigration policies of the United States." Id. sec. 701(a).  Generally speaking, Title VII of the CNRA applies federal immigration laws to the CNMI for the first time, subject to a "transition period" and "transition program" intended to ease the transfer of authority to the federal level. See id. secs. 701(a)-(b).  Specifically, the CNRA provides that federal immigration law shall apply in the CNMI beginning on the "transition program effective date" (November 28, 2009), id. sec. 702(a), § 6(a)(1), and that federal law, including the CNRA's transitional provisions, shall at that time "supersede and replace all laws, provisions, or programs of the Commonwealth relating to the admission of aliens and the removal of aliens from the Commonwealth." Id. sec. 702(a), § 6(f).  The CNRA also specifies that during the transition period, which is slated to end on December 31, 2014, "the Secretary of Homeland Security, in consultation with the Secretary of State, the Attorney General, the Secretary of Labor, and the Secretary of the Interior, shall establish, administer, and enforce a transition program to regulate immigration to the Commonwealth[.]" Id. § 6(a)(2).

Much of the transition program is rather technical, but its most relevant features can be summarized briefly.  Under that program, the Department of Homeland Security ("DHS") is authorized to issue so-called "CNMI-only" permits to foreign workers (including, it seems, those previously admitted to the CNMI *and* those seeking to enter the CNMI) who are not otherwise eligible to reside in the CNMI under federal immigration law.  See CNRA, sec. 702(a), § 6(d)(1)-(3).  These CNMI-only permits will not allow recipients to enter the United States, but they will allow permit holders to live and work in the CNMI subject to the terms of the transition program.  See id. § 6(d)(3)-(4).  The CNMI-only permit program has two purposes: to ensure that CNMI employers have access to an adequate number of employees during the transition period,

and to gradually reduce the number of foreign workers during the transition period. See id. § 6(b)-(d). Thus, DHS' CNMI-only permit system must "provide for a reduction in the allocation of [CNMI-only permits] on an annual basis to zero, during a period not to extend beyond December 31, 2014, unless extended pursuant to . . . this subsection." Id. § 6(d)(2).[4] Moreover, CNMI-only permits will not be valid "beyond the expiration of the transition period." Id.

Finally, the CNRA specifies that foreign workers admitted to the CNMI before the enactment of the CNRA may continue to live and work in the CNMI after the transition program effective date. Significantly, however, the CNRA authorizes the removal of such foreign workers at the end of the period for which they were admitted under CNMI law or two years after the transition program begins (whichever is earlier), unless they obtain a CNMI-only work permit or some other lawful immigration status under federal law. See CNRA, sec. 702(a), § 6(e)(1)-(2).

A little more than a month after the enactment of the CNRA, the CNMI filed a complaint challenging the legality of numerous provisions of the CNRA and a motion requesting that those provisions be enjoined. In Counts I and II of the complaint, as subsequently amended, the CNMI contends that the challenged provisions of the CNRA breach the Covenant that controls the political relationship between the Commonwealth and the United States.[5]

---

[4]    The CNRA authorizes the Department of Labor to extend the CNMI-only permit program beyond December 31, 2014 (indeed, to extend it indefinitely for periods of "up to 5 years" at a time), but only if an extension is necessary to "ensure [that] an adequate number of workers will be available for legitimate businesses in the Commonwealth." CNRA, sec. 702(a), § 6(d)(5)(A).

[5]    This description encompasses only Count I of the CNMI's complaint. Under Count II, the CNMI argues that the CNRA violates the United States Constitution because it was passed "pursuant to . . . a defective political process," and therefore "exceeds Congress's Article I powers to enact legislation with respect to the [CNMI]." Compl. ¶¶ 97, 99. At oral argument, counsel for the CNMI made clear that Count II is not intended to be a separate claim. Rather, it is intended to suggest "a way of looking at" Count I. Transcript of Oral Argument at 68 (Mar. 12, 2009) ("Tr."). Specifically, the purpose of Count II is to encourage the Court to view the

## II.  STANDING AND RIPENESS

### A.  Legal Standards

The defendants argue that the CNMI lacks standing; that its claims are not ripe; and that this suit is not authorized.  Thus, they have moved to dismiss the CNMI's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

"Three inter-related judicial doctrines – standing, mootness, and ripeness – ensure that federal courts assert jurisdiction only over 'Cases' and 'Controversies.'  U.S. Const. art. III, § 2."  Worth v. Jackson, 451 F.3d 854, 855 (D.C. Cir. 2006).  "A federal court is constitutionally forbidden to render advisory opinions or 'to decide questions that cannot affect the rights of litigants in the case before [the Court].'"  Better Gov't Ass'n v. Dep't of State, 780 F.2d 86, 90-91 (D.C. Cir. 1986) (quoting North Carolina v. Rice, 404 U.S. 244, 246 (1971)).  Federal courts are courts of limited jurisdiction, with the ability to hear only cases entrusted to them by a grant of power contained in either the Constitution or in an act of Congress.  See, e.g., Beethoven.com LLC v. Librarian of Congress, 394 F.3d 939, 945 (D.C. Cir. 2005); Hunter v. District of Columbia, 384 F. Supp. 2d 257, 259 (D.D.C. 2005).  A federal court has no subject matter jurisdiction where the plaintiff lacks standing, or where the case is not justiciable because it is either moot or not yet ripe.  See Worth v. Jackson, 451 F.3d at 857.[6]  On a motion to dismiss for

_____

people of the CNMI as "an insular minority with no voice in the [federal legislative] process," and for that reason to "apply heightened scrutiny" to the challenged provisions of the CNRA.  Id. The Court declines to do so.  The CNMI has identified no authority supporting the proposition that heightened scrutiny applies in cases like this, and the Court's independent research has uncovered none.

[6]     While standing and ripeness are at issue in this case, mootness is not.

9

lack of subject matter jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction.  See Brady Campaign to Prevent Gun Violence v. Ashcroft, 339 F. Supp. 2d 68, 72 (D.D.C. 2004).

In determining whether to grant a motion to dismiss for lack of subject matter jurisdiction, the Court must construe the complaint in the plaintiff's favor and treat all well-pled allegations of fact as true.  See Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005).  See also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., 484 U.S. 49, 65 (1987) (courts may not dismiss a complaint for lack of standing if "there are sufficient allegations of fact — not proof — in the complaint or supporting affidavits") (internal quotation marks and citation omitted); Venetian Casino Resort, LLC v. EEOC, 409 F.3d 359, 364 (D.C. Cir. 2005) (on a ripeness challenge, courts "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged") (internal quotation marks and citation omitted).[7]  The Court need not accept unsupported inferences or legal conclusions cast as factual allegations.  See Primax Recoveries, Inc. v. Lee, 260 F. Supp. 2d 43, 47 (D.D.C. 2003).

Whether the CNMI has standing to pursue its claims is a threshold question of subject matter jurisdiction.  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 102 (1998).  In order to establish standing under Article III of the United States Constitution, a plaintiff must show, at an "irreducible constitutional minimum," that (1) it has suffered an injury in fact – the invasion of a legally protected interest; (2) the injury is fairly traceable to the

_____

[7]        The Court may dispose of a motion to dismiss under Rule 12(b)(1) on the basis of the complaint alone or it may in appropriate cases consider materials beyond the pleadings "as it deems appropriate to resolve the question whether it has jurisdiction to hear the case."  Scolaro v. D.C. Bd. of Elections and Ethics, 104 F. Supp. 2d 18, 22 (D.D.C. 2000).  "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

defendants' conduct (a causal connection); and (3) a favorable decision on the merits likely will redress the injury.  Sprint Commc'ns Co., L.P. v. APPC Servs., Inc., 128 S. Ct. 2531, 2535 (2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); see also North Carolina v. EPA, No. 08-1225, slip op. at 6-7 (D.C. Cir. Nov. 24, 2009); Nuclear Info. & Resource Serv. v. Nuclear Regulatory Comm'n, 509 F.3d 562, 567 (D.C. Cir. 2007) (quoting Florida Audubon Soc'y v. Bentsen, 94 F.3d 658, 663 (D.C. Cir. 1996)).  The alleged injury in fact must be concrete and particularized and actual or imminent, not conjectural, hypothetical or speculative.  See Friends of the Earth v. Laidlaw, 528 U.S. 167, 180-81 (2000) ; Lujan v. Defenders of Wildlife, 504 U.S. at 560-61;  Worth v. Jackson, 451 F.3d at 858;  Sierra Club v. EPA, 292 F.3d 895, 898 (D.C. Cir. 2002).  If a plaintiff cannot meet all three prongs of this test, the Court must dismiss the suit for lack of standing.  Where the legality of government action is challenged by the object of that action, "there is ordinarily little question that the action or inaction has caused [or will cause the plaintiff] injury, and that a judgment preventing . . . the action will redress it."  Lujan v. Defenders of Wildlife, 504 U.S. at 561-62.

The defendants also seek dismissal of the CNMI's complaint on ripeness grounds.  Ripeness is also a threshold question of subject matter jurisdiction.  The ripeness inquiry examines "whether a question has sufficiently matured to be amenable to adjudication."  Flynt v. Rumsfeld, 355 F.3d 697, 702 (D.C. Cir. 2004).  Its primary purpose "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" with other branches of the federal government.  Hillblom v. United States, 896 F.2d 426, 430 (9th Cir. 1990) (internal quotation marks and citation omitted).  Its roots "are found in both the Article III requirement of 'case or controversy' and prudential considerations favoring

the orderly conduct of the administrative and judicial processes." State Farm Mut. Auto. Ins. Co.

v. Dole, 802 F.2d 474, 479 (D.C. Cir. 1986).  As the D.C. Circuit has explained:

> The framework for assessing ripeness was established in [Abbott
> Laboratories v. Gardner, 387 U.S. 136, 148 (1967)], in which the
> Supreme Court provided a two-pronged test that requires a
> reviewing court to evaluate both the fitness of the issues for judicial
> decision and the hardship to the parties of withholding court
> consideration. . . .   Under the "fitness of the issues" prong, the first
> question . . . is whether the disputed claims raise purely legal
> questions and would, therefore, be presumptively suitable for
> judicial review. . . .   Next, [the court] consider[s] whether the court
> or the agency would benefit from postponing review until the policy
> in question has sufficiently "crystallized" by taking on a more
> definite form. . . .   The "hardship" prong of the Abbott Laboratories
> test is not an independent requirement divorced from the
> consideration of the institutional interests of the court and agency.

Venetian Casino Resort, LLC v. EEOC, 409 F.3d at 364 (internal quotation marks and citations

omitted).[8]  Here, the defendants contend that this matter is not ripe because the injuries alleged by

the CNMI are too "remote," "nebulous," and "contingent" to justify immediate judicial review.

See Mot. Dismiss Reply at 11.

### B.  Plaintiff's Standing and Ripeness of the Issues

When the defendants filed their motion to dismiss, the DHS had not yet issued

regulations implementing the relevant portions of the CNRA.  In late October 2009, however, the

Department issued two interim rules scheduled to go into effect on or about November 28, 2009,

the effective date of the Act.  The first sets forth the regulations that will govern the transition

worker permit program challenged by the CNMI in this action.  See Commonwealth of the

Northern Mariana Islands Transitional Worker Classification, 74 Fed. Reg. 55,094 (Oct. 27,

---

[8]      "While Abbott addressed potential conflicts with administrative agencies, the
doctrine is also applicable to actions of the President and of Congress."  Hillblom v. United
States, 896 F.2d at 430.

2009) (to be codified in scattered parts of 8 C.F.R.) ("Interim Permit Rule").  The second,

characterized as "an interim final rule," amends existing DHS and Department of Justice

regulations to reflect the imminent application of the United States immigration laws to the

CNMI.  See Application of Immigration Regulations to the Commonwealth of the Northern

Mariana Islands, 74 Fed. Reg. 55,726 (Oct. 28, 2009) (to be codified in scattered parts of 8

C.F.R.) ("Interim Immigration Rule").

> The Interim Permit Rule creates a federal scheme for issuing transitional worker

permits to foreign workers in the CNMI and establishes the criteria that employers must meet in

order to be eligible to receive permits for guest workers.  See 74 Fed. Reg. at 55,109.  Ultimately,

according to plaintiff, because this regulatory scheme will reduce the number of foreign worker

permits to zero by December 31, 2014, it "ousts local control over two-thirds of the

Commonwealth's private-sector workforce, dictates the ultimate removal of that population from

the CNMI, and [fails to accommodate] the devastating economic consequences this will have

upon the Commonwealth."  CNMI Supp. Mem. at 3.  Over the next two to five years, plaintiff

says, this regulatory regime "will wipe out two-thirds of the CNMI's private-sector work force"

and therefore is totally incompatible with the Commonwealth's guarantee of local self-

government. Id. at 4.  According to plaintiff, this federalization of immigration and foreign

worker-related labor matters in the CNMI violates sections of the Covenant which call for local

control over local matters and require mutual consent for modifications to the Covenant.  See

Compl. ¶¶ 83-92.

> By contrast, the defendants argue that the issuance of these regulations does not

undermine their arguments that plaintiff has no standing to bring this suit or that its arguments are

not ripe for decision.  They maintain that, despite the issuance of the regulations, the injuries

alleged by the CMI under the statute and the Covenant are remote and speculative and are not concrete, actual or imminent, and that the issuance of the regulations does nothing to make the plaintiff's alleged injuries any more concrete, actual or imminent.  The Court disagrees and concludes both that plaintiff has standing to sue and that the issues it raises are ripe for decision.

Section 103 of the Covenant reserves to the CNMI the right to local self-government.  While the scope and nature of the right to local self-government are certainly debatable, there is no doubt that the right constitutes a judicially enforceable (and hence legally protected) interest.  See Covenant § 903 (undertakings by the United States government provided for in the Covenant are enforceable in federal courts of the United States); United States ex rel. Richards v. De Leon Guerrero, 4 F.3d at 754-55 (adjudicating dispute over whether challenged federal administrative action violated CNMI's right to self-government under the Covenant); Hillblom v. United States, 896 F.2d at 431 (noting that "challenge[s] to a specific statute which [allegedly] violates a provision of the Covenant . . . are generally within the authority of the Court").  The CNMI claims that the CNRA violates its right to local self-government, principally by federalizing control over immigration and foreign worker-related labor matters in the CNMI.  For purposes of the standing analysis, the Court assumes that the CNMI's interpretation of the statute is correct, and that the federalization of authority contemplated by the CNRA violates Section 103.  See Parker v. District of Columbia, 478 F.3d 370, 377 (D.C. Cir. 2007) ("[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."); Info. Handling Servs., Inc. v. Defense Automated Printing Servs., 338 F.3d 1024, 1030 (D.C. Cir. 2003) ("[A]t the motion to dismiss stage, a plaintiff's non-frivolous contention regarding the meaning of a statute must be taken as correct for purposes of standing.").  Thus, the CNMI has adequately alleged the invasion of a "legally protected interest"

14

— its right to local self-government — that is concrete, particularized and imminent.  See Lujan v. Defenders of Wildlife, 504 U.S. at 560.  It therefore has satisfied the injury-in-fact element of standing.

The CNMI also has satisfied the causation element of standing, because the injury of which it complains is "fairly traceable" to the enactment of the CNRA — and now also traceable to the promulgation of the regulations as well.  Allen v. Wright, 468 U.S. 737, 750 (1984) (causation element is satisfied if the plaintiff "allege[s] personal injury fairly traceable to the defendant's allegedly unlawful conduct").  Again, the principal injury alleged by the CNMI is the federalization of control over immigration and foreign worker-related labor matters in the CNMI.  That federalization of control is mandated by the CNRA and will be carried out by the responsible federal agencies, particularly DHS, under the statute and the regulations just issued.  Thus, "the challenged acts of the defendant[s], not of some absent third party, will cause the particularized injury of the plaintiff."  Florida Audubon Soc'y v. Bentsen, 94 F.3d at 663.

Finally, the CNMI has satisfied the redressability element.  "Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff."  Florida Audubon Soc'y v. Bentsen, 94 F.3d at 663-64 (footnote and citations omitted).  Were the Court to permanently enjoin the defendants from enforcing the CNRA as violative of the Covenant, the regulations would also fall, the challenged provisions would not be implemented, and the CNMI would not suffer the loss of governmental autonomy and control it fears.  Thus, the injury alleged by the CNMI is redressable, and the plaintiff clearly has standing.

As for ripeness, for many of these same reasons, the Court concludes that the injuries alleged by CNMI are not too remote or contingent to justify immediate judicial review.

15

Plaintiff will be injured once the statute and regulations take effect.  Furthermore, the issues plaintiff raises clearly are fit for judicial decision, and they implicate legal issues amenable to such decision.  The issuance of the regulations has merely "crystallized" the questions for judicial consideration, and nothing would be gained by postponing a decision.  See Venetian Casino Resort, L.L.C. v. EEOC, 409 F.3d at 365.  The Court concludes that plaintiff has standing and that the issues it raises clearly are ripe for decision.

The defendants' arguments to the contrary are not persuasive.  According to the defendants, the CNMI's allegations of non-economic injury (i.e., the CNMI's allegations of injury arising from the loss of local autonomy and control) are insufficient because (1) it is speculative to assert that the CNMI will suffer any loss of local autonomy and control under the CNRA; and (2) in alleging such non-economic injuries the CNMI is impermissibly "attempt[ing] to revamp economic and related injuries as injuries to its alleged right of self-governance to avoid the determination that these injuries are inherently speculative."  Mot. Dismiss Reply at 5.  The Court rejects both arguments.[9]

The CNMI's allegations of non-economic injury are not speculative.  There is no dispute that the CNRA takes away from the CNMI control over immigration matters and federalizes control over such matters, see CNRA, sec. 702(a), § 6(f), and thereby effectively preempts the CNMI's local immigration laws.  Were there ever any doubt about precisely how the CNRA will preempt or supplant local labor laws, see Mot. Dismiss Reply at 5, the regulations issued on October 27 and October 28, 2009 make clear the extent of the federal role; their

---

[9]    Defendants also initially argued that it remains unclear "what the regulations implementing the CNRA will look like, or what affect they will have."  Mot. Dismiss Reply at 5. With the issuance of the regulations, that argument is now moot.

issuance undermines defendants' argument that plaintiff's asserted non-economic harm is speculative.  See id.

As for defendants' argument that the CNMI's allegations of non-economic injury are recent inventions designed to avoid the force of the defendants' attacks on the CNMI's allegations of economic injury, Mot. Dismiss Reply at 3-4, defendants are simply wrong.  The CNMI's allegations of non-economic injury are plainly distinct from its allegations of economic injury, and the CNMI has relied on such allegations – the loss of local autonomy and control – from the outset of this case.  See, e.g., Compl.  ¶¶ 60-63, 72-73, 80-81, 95.  See also P.I. Mot. at 1, 34-35.

## III.  AUTHORIZATION

That brings the Court to the last of the defendants' jurisdictional arguments.  According to the defendants, the CNMI's complaint must be dismissed because this suit is not authorized under the laws of the CNMI.  Specifically, the defendants argue that (1) the CNMI's Constitution and civil code provide that any action brought by the CNMI must be brought on the authority of the Attorney General of the CNMI, see Mot. Dismiss Reply at 12 (citing CNMI Const., art. III § 11 and 1 CMC § 2154); (2) this suit "appears to be driven by the Governor and his counsel" rather than by the CNMI's Attorney General, id. at 13 n.7; and thus (3) this suit must be dismissed because the Governor lacks authority to sue on behalf of the CNMI.  See id. at 13-14.  The defendants take the view that this suit is "driven by the Governor and his counsel" rather than by the Attorney General mainly because the complaint is signed not by the Attorney General or one of his assistants but instead by the law firm of Jenner & Block and attorney Howard Willens, who is identified in the complaint as "Special Legal Counsel to the Governor."

In response, the CNMI argues that the Governor of the CNMI is not a party to this case, and that Mr. Willens' presence does not signify otherwise because Mr. Willens also serves as an Assistant Attorney General in the CNMI.  See Mot. Dismiss Opp. at 18 n.12.  The CNMI further argues that the Attorney General has both authorized this suit and authorized Mr. Willens and Jenner & Block to prosecute it on behalf of the CNMI.  See id. at 17-18.  To support that claim, the CNMI points to two letters written by Gregory Baka, the Acting Attorney General of the CNMI.  In the first letter, written to a local legislator, Mr. Baka states:

> [I]n full compliance with the CNMI Constitution the Office of the Attorney General (OAG) has for decades referred various matters to outside counsel, whether due to conflicts, lack of specialized experience, or resource constraints.  There is no legal requirement that this delegation be in writing, or even express.  Hundreds of pleadings are filed annually by the OAG without the AG's personal review or signature.  Yet as the Deputy Attorney General (currently Acting AG . . . ) I did personally review and comment upon various drafts of the Complaint in our Section 903 litigation [*i.e.*, this suit].

Id., Ex. 1, Letter from Acting Attorney General Gregory Baka at 2 (Oct. 24, 2008).  In the second letter, written to this Court, Mr. Baka states:  "I understand that the United States has argued that the esteemed constitutional law firm of Jenner & Block is not authorized to represent the [CNMI] in [this suit].  This is not true.  Jenner & Block is authorized to represent the CNMI."  Letter from Acting Attorney General Gregory Baka at 1 (Feb. 13, 2009).

In the Court's view, these letters adequately demonstrate that this suit has been authorized by the Office of the Attorney General of the CNMI and that the Acting Attorney General has delegated his authority to prosecute the suit to Mr. Willens and to Jenner & Block. To conclude otherwise would require the Court to infer that Mr. Baka has not authorized this suit, but nevertheless written two artfully worded letters meant to conceal that fact from a local legislator and from this Court.  Nothing in the record warrants that inference.

The Court thus concludes that the CNMI has standing to pursue its claims; the CNMI's claims are ripe; and the CNMI's suit is properly authorized.  The Court therefore will deny the defendants' motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## IV.  THE MERITS

### A.  Standard of Review

The Court now turns to the defendants' arguments for dismissing Counts I and II of the CNMI's amended complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Rule 12(b)(6) allows dismissal of a complaint if a plaintiff fails "to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court clarified this standard.  The Court in Twombly noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'"  Id. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Aktieselskabet AF 21 v. Fame Jeans Inc., 525 F.3d 8, 15 (D.C. Cir. 2008).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. at 555.  The Court stated that there was no "probability requirement at the pleading stage," id. at 556, but "something beyond . . . mere possibility . . . must be alleged[.]"  Id. at 557-58.  The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," id. at 555, or must be sufficient "to

state a claim for relief that is plausible on its face." Id. at 570. See also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). The Court in Twombly referred to this newly clarified standard as "the plausibility standard." Bell Atlantic Corp. v. Twombly, 550 U.S. at 560 (abandoning the "no set of facts" language from Conley v. Gibson).

On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all of the factual allegations contained in the complaint. See Bell Atlantic Corp. v. Twombly, 550 U.S. at 555. The complaint "is construed liberally in the [plaintiff's] favor, and [the Court should] grant [the plaintiff] the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiff's legal conclusions. See id. See also Ashcroft v. Iqbal, 129 S. Ct. at 1949-50.

## B.  Interpretation of the Covenant

"[T]he authority of the United States towards the CNMI arises solely under the Covenant."  United States ex rel Richards v. Guerrero, 4 F.3d at 754 (citing Hillblom v. United States, 896 F.2d at 429) (internal quotation marks omitted). The CNMI argues that Congress acted in excess of that authority in passing the challenged provisions of the CNRA, and that, as a result, those provisions must be enjoined. See Compl. ¶¶ 83-92. The Court disagrees.

"The Covenant is divided into ten articles that define the CNMI's legal and political relationship with the United States." Mot. Dismiss at 6. Article I (entitled "Political

Relationship") and Article V (entitled "Applicability of Laws") are most relevant here.  Section

103 of Article I provides:

> The people of the [CNMI] will have the right of local self-
> government and will govern themselves with respect to internal
> affairs in accordance with a Constitution of their own adoption.

Covenant § 103.  Section 105 of Article I provides:

> The United States may enact legislation in accordance with its
> constitutional processes which will be applicable to [the CNMI],
> but if such legislation cannot also be made applicable to the several
> States [the CNMI] must be specifically named therein for it to
> become effective in [the CNMI].  In order to respect the right of
> self-government guaranteed by this Covenant the United States
> agrees to limit the exercise of that authority so that the fundamental
> provisions of this Covenant, namely Articles I, II and III, and
> Sections 501 and 805, may be modified only with the consent of the
> Government of the United States and the Government of [the
> CNMI].

Covenant § 105.  Section 503 of Article 5 provides:

> The following laws of the United States, presently inapplicable to
> [the CNMI], will not apply to [the CNMI] except in the manner and
> to the extent made applicable to them by the Congress by law after
> [November 3, 1986]: (a) . . . the immigration and naturalization
> laws of the United States[.]

Covenant § 503.

It is undisputed that the CNRA meets the requirements set forth in the first

sentence of Section 105.  See Tr. at 11.  While the relevant portion of the CNRA is not legislation

that has been "made applicable to the several States," the CNRA does "specifically name [the

CNMI]" and thus can become effective in the Commonwealth.  It is the second sentence of

Section 105 which plays a more important role in this case.  As noted, that sentence provides in

pertinent part:

> In order to respect the right of self-government guaranteed by this
> Covenant the United States agrees to limit the exercise of [its
> legislative] authority so that the fundamental provisions of this
> Covenant, [including Section 103], may be modified only with the
> consent of the Government of the United States and the
> Government of the Northern Mariana Islands.

Covenant, art. I § 105.  The parties frequently refer to that sentence as the "mutual consent

provision," because it requires both the CNMI and the United States to consent to any

"modifications" of the so-called "fundamental provisions" of the Covenant.   According to the

CNMI, however, the CNRA runs afoul of Section 103 of the Covenant, which is one of those

provisions identified as fundamental, and which guarantees the CNMI "the right of local self-

government" and the right to "govern [itself] with respect to internal affairs."   Under the terms of

the second sentence of Section 105, plaintiff argues, Congress may not unilaterally alter those

guarantees.

Sections 105 and 103 – themselves general grants or reservations of authority – are

related to two additional sections of the Covenant that, during the early days of the

Commonwealth, determined the initial applicability to the CNMI of several laws or categories of

laws of the United States.  Section 502 lists certain sets of laws, such as those "regarding coastal

shipments" and those "which provide federal services and financial assistance programs," that, by

agreement of the United States and the Commonwealth, became controlling in the CNMI upon or

soon after the adoption of the Covenant.  See Covenant § 1003(b) (specifying the effective date of

Section 502).  By contrast, Section 503 identifies groups of federal laws that, again by agreement

of the United States and the Commonwealth, would not automatically become effective in the

CNMI after the adoption of the Covenant, but could be "made applicable to" the Commonwealth

by Congress at a later date:

> The following laws of the United States, presently inapplicable to the Trust Territory of the Pacific Islands, will not apply to the Northern Mariana Islands except in the manner and to the extent made applicable to them by the Congress by law after termination of the Trusteeship Agreement:
>
> > (a) . . . the immigration and naturalization laws of the United States;
> >
> > (b) . . . the coastwise laws of the United States . . .; and
> >
> > (c) the minimum wage provisions of Section 6, Act of Jun 25, 1938, 52 Stat. 1062, as amended.

In light of Section 503(a), the CNMI acknowledges that "the imposition of the federal immigration laws [on the CNMI] is expressly within Congress's power under the Covenant."  P.I. Mot. at 20.  Despite this point of agreement, the parties and *amicus* CNMI Descent spend a great deal of time debating whether Congress' admitted authority to apply "the immigration and naturalization laws of the United States" to the Commonwealth derives from Section 503 or Section 105.  CNMI Descent, and perhaps the CNMI itself, <u>see</u> Tr. at 9, essentially contend that all of Congress' authority to legislate for the Commonwealth derives from a single source: Section 105.  <u>See</u> *Amicus* Brief at 25-26.  Under this theory, Section 503 affirmatively grants to Congress no power beyond that which is already conferred by Section 105; Section 503 merely memorializes the understanding of the United States and the CNMI at the time of the formation of the Covenant as to which federal laws would not automatically apply to the Commonwealth.  <u>Id</u>.  The defendants, on the other hand, insist that Section 503 itself gives Congress authority, independent of any conveyed by Section 105, to apply federal immigration laws to the CNMI.  P.I. Opp. at 23-24.

23

The parties vigorously contest this point because, if Congress' authority over immigration in the CNMI derives from Section 503, then that authority, exercisable "in the manner" and "to the extent" that Congress desires, is not subject to the requirement of Section 103 that the Commonwealth retain control over its internal affairs.  See P.I. Opp. at 24.  If that authority instead originates with Section 105, then it must — according to the CNMI and CNMI Descent — be exercised only to the extent that it does not interfere with the CNMI's rights under Section 103.  See Tr. at 9; *Amicus* Brief at 30.

To the extent that the distinction matters, the Court agrees with the defendants. Section 503 of the Covenant plainly states that Congress may, after the expiration of the trusteeship agreement, apply the "immigration and naturalization laws of the United States" to the "Northern Mariana Islands . . . in the manner and to the extent" it chooses.  Covenant § 503.  The Court reads that language as an affirmative grant of authority to the United States to apply federal immigration laws to the CNMI, and to do so in any "manner" and to any "extent" it sees fit — that is, notwithstanding any limits imposed by Sections 103 and 105.[10]  Section 503 by its terms is an express reservation of Congress' right to apply federal immigration and naturalization laws to the CNMI, through appropriate legislation — provided it does so only after the expiration of the Trusteeship Agreement.  The Trusteeship Agreement expired on November 3, 1986. Compl. ¶ 38. Thus, the Court concludes that under the express and unambiguous language of Section 503 of the Covenant, Congress was free after November 3, 1986, to apply the immigration and naturalization laws of the United States to the CNMI.  As a result, the CNRA is a legitimate

---

[10]     Because the language of Section 503 is clear, the Court reaches this conclusion without resort either to other sections of the Covenant or to its legislative history.

exercise of federal congressional authority so long as its challenged provisions qualify as being among "the immigration and naturalization laws of the United States."

The Court notes, however, that even if Congress' authority to enact legislation governing immigration in the CNMI derived from Section 105, neither the Court's plain meaning statutory analysis nor its ultimate conclusion would change.  If Section 503 is an affirmative grant of authority that exists outside of any limitations imposed by Sections 103 and 105, then any statute that falls within the Section's terms is authorized under the Covenant, and the CNRA is authorized if it is in fact one of "the immigration and naturalization laws of the Untied States."  If Section 503 merely explains how the authority granted to Congress by Section 105 was to be exercised during the period following the enactment of the Covenant — as the CNMI and CNMI Descent contend — then Section 503 is nevertheless definitive evidence that the drafters of the Covenant believed Section 105 gave Congress the authority to apply "the immigration and naturalization laws of the United States" to the Commonwealth "in the manner" and "to the extent" that Congress saw fit.  As a necessary corollary, the drafters could not have believed that immigration and naturalization were "internal affairs" over which the CNMI was to have primary authority.  Therefore, so long as the CNRA qualifies as an "immigration and naturalization law[]," it does not trench upon the "internal affairs" of the Commonwealth within the meaning of Section 103.

As this analysis demonstrates, whether Congress acted by authority conferred by Section 503 or by Section 105, it acted validly in adopting the CNRA if the statute qualifies as one of the "immigration and naturalization laws of the United States."  Perhaps recognizing the implications of this proposition, the CNMI argues that the provisions of the CNRA in question "cannot be characterized as 'federal immigration and naturalization laws' without emptying those

terms of meaning." Mot. Dismiss Opp. at 30.  The CNMI asserts that the CNRA "go[es] far beyond the imposition of the federal immigration laws on the Commonwealth, and constitute[s] a broad assault upon the Commonwealth's existing economy and fundamental right to self-government " as guaranteed by Section 103 and secured by Section 105.  Id.[11]  According to the CNMI, the principal problem with the CNRA is that it does not limit its reach to "control over the Commonwealth's borders."  P.I. Mot. Reply at 10.  Instead, it also applies to foreign workers already within the Commonwealth and therefore constitutes an "affront to the Commonwealth's control over internal affairs," since those foreign workers (1) make up a large proportion of the CNMI's labor pool, (2) were admitted pursuant to the CNMI's locally enacted immigration program prior to the effective date of the CNRA, and (3) receive a variety of protections under CNMI law.  See P.I. Mot at 35-36.  The Court disagrees with this analysis, and concludes that the challenged provisions of the CNRA are, in fact, "immigration and naturalization laws of the United States."

---

[11]      The CNMI further argues that certain provisions of the CNRA inflict needless economic hardships on the CNMI and therefore are inconsistent with Section 701 of the Covenant, which provides that

> the United States will assist the Government of the Northern Mariana Islands in its efforts to achieve a progressively higher standard of living for its people as part of the American economic community and to develop the economic resources needed to meet the financial responsibilities of local self-government.

Covenant § 701.  The Court does not treat the alleged inconsistency between the CNRA and Section 701 as a separate argument because (1) the CNMI seems to regard any rights protected by Section 701 as incidents of the more fundamental right to local self-government reserved in Section 103 and protected by Section 105, see, e.g., Compl. ¶ 33; and (2) the CNMI relied on Section 701 only sporadically throughout its papers and at oral argument.

*C. Title VII of the CNRA as Immigration Law*

The challenged portions of the CNRA explicitly apply the federal Immigration and Nationality Act to the CNMI, sec. 702(a), § 6(a)(1); provide for an interim program under which DHS will determine which and how many foreign workers will be authorized to work in the Commonwealth, <u>id</u>. § 6(b)-(d); limit the ability of DHS to remove certain foreign workers for a limited period after the effective date of the statute, <u>id</u>. § 6(e); preempt all CNMI laws "relating to the admission of aliens and the removal of aliens from the Commonwealth," <u>id</u>. § 6(f); and remove the portion of Section 503 of the Covenant that permits the application of United States immigration laws to the Commonwealth, <u>id</u>., sec. 702(g).  Given that every one of these provisions concerns the admission of noncitizens into the CNMI, their removal from the CNMI, or their authorization to work within the CNMI, it is impossible to say that these provisions are not "immigration and naturalization laws."  Plaintiff's arguments to the contrary are unavailing.

First, the CNMI's argument that the CNRA cannot be viewed as an "immigration law" is unpersuasive, largely for the reasons stated by the defendants.  <u>See</u> Mot. Dismiss Reply at 17-23.  The fact that the CNRA is not codified in Title 8 of the United States Code, <u>see</u> Mot. Dismiss Opp. at 29, is irrelevant.  That title is not the repository of all federal immigration laws, which are defined by their subject matter, not their location in the Code.  <u>See</u> INA § 101(a)(17) (defining "immigration laws" as "this Act and all laws, Conventions, and treaties of the United States relating to the immigration, exclusion, deportation, expulsion, or removal of aliens"); <u>United States v. Zuger</u>, 602 F. Supp. 889, 890 (D. Conn. 1984) ("Acts of Congress do not take effect or gain force by virtue of their codification into the United States Code; rather, they are simply organized in a comprehensive way under the rubric of appropriate titles, for ready reference."); <u>see also</u> <u>Turner v. Glickman</u>, 207 F.3d 419, 428 (7th Cir. 2000) (arrangement of

27

statutes in United States Code does not reflect any intent of Congress); Murrell v. W.U. Telegraph Co., 160 F.2d 787, 788 (5th Cir. 1947) ("The statutes collected in [the United States Code] did not change their meaning nor acquire any new force by their inclusion.").

        Second, plaintiff is just plain wrong when it asserts that nothing in federal immigration and naturalization law permits an "employer-by-employer, worker-by-worker local labor permitting scheme."  Mot. Dismiss Opp. at 30.  As defendants point out with ample support, see Mot. Dismiss Reply at 19-20; see also Tr. at 47-48, precisely such schemes are at the heart of federal immigration law.  See, e.g., 8 U.S.C. § 1153(b) (explaining how employment-based visas are to be allocated); 8 U.S.C. § 1184(c) (providing that "[t]he question of importing any alien as a nonimmigrant worker under [certain sections] of this title in any specific case . . . shall be determined by the Attorney General . . . upon petition of the importing employer ").  Finally, and for similar reasons, the fact that the application of federal immigration laws to the CNMI through the CNRA may have a dramatic impact upon the CNMI's labor force does not convert an immigration law into a labor law.  It has long been recognized that immigration laws necessarily have a significant impact on labor markets and practices.  See, e.g., INS v. Nat'l Center for Immigrants' Rights, Inc., 502 U.S. 183, 195 (1991) ("[A] primary purpose in restricting immigration is to preserve jobs for American workers."); De Jesus Ramirez v. Reich, 156 F.3d 1273, 1274-75; (D.C. Cir. 1998) (discussing relationship between employment market and administration of immigration).  There is thus no question that the relevant portions of the CNRA are immigration laws explicitly authorized by the Covenant.

D.  Application of <u>Richards</u>: The Balancing Test

Even if the Court were to agree with the CNMI that the CNRA is not an

"immigration and naturalization law" which Congress is specifically authorized by the Covenant

to enact, the Court would still find the CNRA valid under the Covenant.  The Court recognizes,

contrary to defendants' argument, <u>see</u> Mot. Dismiss at 31-32, that Sections 103 and 105 of the

Covenant impose substantive limits on Congress' authority to legislate with respect to the CNMI

in order to protect the Commonwealth's right to govern itself with regard to internal affairs.  All

persuasive authority points to this conclusion.  <u>See</u>, <u>e.g.</u>, <u>United States v. Chang Da Liu</u>, 538 F.3d

at 1084 (noting that "the Covenant does limit Congress's legislative power"); <u>Sagana v. Tenorio</u>,

384 F.3d 731, 734 (9th Cir. 2004) ("The Covenant guarantees the CNMI a measure of self-

government, giving the people of the CNMI control over its internal affairs."); <u>United States ex.

rel. Richards v. De Leon Guerrero</u>, 4 F.3d at 754 (ruling that the Commonwealth's interest in self-

government must be weighed against the interests of the federal government in order to determine

whether actions of the United States that are not clearly authorized by the Covenant are

nevertheless permissible).  The defendants can cite only the district court decision upheld by the

Ninth Circuit in the <u>Richards</u> case as support for their interpretation of Sections 103 and 105.  <u>See

United States ex rel. Richards v. De Leon Guerrero</u>, Misc. No. 92-0001, 1992 WL 321010, at *25

(D.N.M.I. July 24, 1992).  They fail to acknowledge, however, that in affirming the district

court's decision the Ninth Circuit did not endorse the district court's Guarantee Clause analogy,

and in fact employed an analysis that implicitly recognized the substantive nature of the rights

conferred upon the Commonwealth by Sections 103 and 105.

While the Court therefore rejects the defendants' interpretation of the Covenant in

this regard and accepts the view that Sections 103 and 105 impose substantive limits on

Congress' legislative authority, it nevertheless finds that the CNRA does not transgress those limits.  It does so by applying the balancing test articulated by the Ninth Circuit in United States ex rel. Richards v. De Leon Guerrero, 4 F.3d 749 (9th Cir. 1993).

In Richards, the Inspector General of the United States Department of the Interior issued a subpoena to the governor of the CNMI, seeking certain tax records for the purpose of conducting an audit of the CNMI's Department of Finance under the Insular Areas Act.  See 48 U.S.C. § 1681b (authorizing the Inspector General to audit the accounts of the CNMI).  The CNMI refused to comply with the subpoena.  The district court enforced the subpoena, and the CNMI appealed to the Ninth Circuit, arguing that "the enforcement of the subpoena [would violate] the CNMI's right to local self-government, in contravention of both the plain meaning and the negotiating history of Sections 103 and 105 of the Covenant[.]"  United States ex rel. Richards v. De Leon Guerrero, 4 F.3d at 752.  More specifically, the CNMI argued that

> a federal audit of Commonwealth finances intrudes upon the Commonwealth's right of local self-government reserved under Section 103 of the Covenant [and] because of this alleged conflict between the Insular Areas Act and Section 103, the enactment of § 1681b exceeds the scope of congressional lawmaking authority permitted by Section 105 of the Covenant.

Id. at 754.

The Ninth Circuit rejected this argument.  As an initial matter, the court of appeals acknowledged that "the authority of the United States toward the CNMI arises solely under" – and hence is limited by – "the Covenant."  United States ex rel. Richards v. DeLeon Guerrero, 4 F.3d at 754 (quoting Hillblom v. United States, 896 F.2d at 429).  But it declined the CNMI's invitation to read Sections 103 and 105 as "carving out an area of 'local affairs' immune from federal legislation."  Id. at 755.  Rather, the court of appeals "interpret[ed] the first sentence of

Section 105 to mean that the United States must have an identifiable federal interest that will be served by the relevant legislation." Id. at 754.  It interpreted the second sentence (that is, the mutual consent provision) to mean that a reviewing court should "balance the federal interest to be served by the legislation at issue against the degree of intrusion into the internal affairs of the CNMI" in order to "give due consideration to the interests of the United States and the interests of the Commonwealth as reflected in Section 105[.]" Id. at 755.  Employing this balancing test, the Ninth Circuit held that the "federal audit [did not] impermissibly intrude[] on the internal affairs of the CNMI" and thus did not violate Section 105 because "the United States has a substantial federal interest in monitoring the CNMI's collection of taxes," and because permitting the audit did not unduly intrude upon the local affairs of the CNMI.  Id.

Amicus curiae CNMI Descent argues that the Ninth Circuit's balancing test is the only workable approach here because (1) "the Covenant's text . . . sets up rival spheres of authority for the U.S. and the CNMI without explaining how to reconcile or distinguish them in mixed or borderline cases," Amicus Supp. at 2; and (2) this case is an excellent example of a "borderline" case.  It notes:

> The CNMI's necessary economic reliance on foreign tourism, investment and labor means that the issue of immigration is deeply and inextricably intertwined with internal social and economic affairs, power over which is vested in the CNMI people by Section 103 of the Covenant.  At the same time, however, the issue can potentially have defense and foreign policy implications, areas committed to the US by Section 104.  In such a situation, a balancing test is necessary to determine where local legislative authority ends and federal [authority] begins.

Id.[12]  At oral argument, the CNMI seemed to agree with *amicus* that the Richards balancing test would be an appropriate way to determine whether the CNRA violated Section 105 if there was some ambiguity as to whether the CNRA constituted "a violation of the covenantal promise of self-government" protected by Sections 103 and 105 and whether the drafters of the Covenant would have viewed the regulation of foreign workers as an "internal" matter implicating "local self-government."  Tr. at 27-28.[13]

For purposes of this alternative analysis, the Court assumes that the matter is ambiguous.  Agreeing with the defendants and *amicus*, the Court thinks it appropriate in such a case to measure the CNRA against Sections 103 and 105 by employing the balancing test articulated by the Ninth Circuit in Richards.  Applying that balancing test here, the Court easily concludes that the challenged provisions of the CNRA comply with Sections 103 and 105, and thus that the CNMI has failed to state a claim upon which relief can be granted.

---

[12]  Notably, the  Supreme Court of the CNMI has expressed a similar view.  See In Re Pangelinan, No. cv-07-0015, 2008 WL 2670073, at *19 (N. Mar. I. 2008).

[13]  In its papers, the CNMI had taken a different approach, urging the Court *not* to apply the balancing test applied in Richards, arguing that the balancing test is flawed because it has no support in the text of the Covenant, and because it "undercuts the CNMI's right to have the Covenant enforced according to its terms by improperly permitting the United States to evade its covenantal obligations if it can point to a sufficiently compelling federal interest."  CNMI Supp. at 1-2; see also id. at 3 ("By adopting a test that weighs the federal interests against the degree of federal intrusion into the CNMI's local affairs, the Ninth Circuit has effectively authorized the United States to abrogate the CNMI's rights if it can point to a sufficiently important countervailing interest.").  The CNMI initially would have had the Court measure the CNRA against Section 105 using a straightforward contract law approach.  See id. at 4 (arguing that "the Court should enforce the Covenant according to its terms"); Tr. at 24 (arguing that the Covenant is in "essence a contract").

*E. Application of the* <u>Richards</u> *Test*

1.  Federal Interests

In enacting the CNRA, Congress sought to ensure (1) "that effective border control procedures are implemented and observed" in the CNMI; and (2) "that national security and homeland security issues are properly addressed" in the CNMI.  CNRA § 701(a)(1)-(2).  The question under the <u>Richards</u> balancing test is whether these federal interests outweigh the intrusion into local affairs contemplated by the CNRA.  For the reasons that follow, the Court concludes that the answer to that question is "yes."

As an initial matter, there is no question that the federal interests identified by the CNRA are weighty and legitimate.  The Covenant makes clear that the CNMI exists "under the sovereignty of the United States."  Covenant § 101.  It also makes clear that the United States "will have complete responsibility for and authority with respect to matters relating to foreign affairs and defense affecting the Northern Mariana Islands."  <u>Id</u>. § 104.  The Covenant thereby incorporates the time-honored and uncontroversial principle that the United States, as a sovereign entity, is obliged to defend and to conduct foreign affairs on behalf of those entities over which it exercises sovereignty.  <u>See</u>, <u>e.g.</u>, <u>Northern Mariana Islands v. United States</u>, 399 F.3d 1057, 1063 (9th Cir. 2005) (recognizing the "inherent obligations placed on the sovereign governing entity to conduct international affairs and control matters of national concern").  Thus, the United States has legitimate interests in matters implicating its sovereignty, including matters implicating foreign affairs and security.  It is equally clear that a sovereign's interests in foreign affairs and security are served by controlling the borders over which it possesses sovereignty and by controlling aliens within those borders.  <u>See</u>, <u>e.g.</u>, <u>Landon v. Plasencia</u>, 459 U.S. 21, 34 (1982) (noting that "control over matters of immigration is a sovereign prerogative" of the United States

and that "[t]he government's interest in efficient administration of the immigration laws at the

border . . . is weighty"); <u>Kleindienst v. Mandel</u>, 408 U.S. 753, 765 (1972) (observing that "the

power to exclude aliens is inherent in sovereignty, necessary for maintaining normal international

relations and defending the country against foreign encroachments and dangers") (internal

quotation marks and citations omitted).  Accordingly, the Court concludes that the CNRA serves

"identifiable federal interest[s][.]"  <u>United States ex rel. Richards v. De Leon Guerrero</u>, 4 F.3d at

754.

       The CNMI attempts to avoid this conclusion by arguing that "Congressional

concerns regarding border control and national and homeland security are both irrelevant and

unnecessary."  CNMI Supp. at 7.  Specifically, the CNMI argues that (1) the provisions of the

CNRA dealing with foreign workers already admitted to the CNMI "have nothing whatever to do

with border security" but rather are concerned with internal labor matters; (2) "Congress's

concerns over border and homeland security are gratuitous" because "[t]he CNMI has excellent

border security and poses no threat to the U.S.'s homeland security"; and (3) "no evidence exists

that the CNMI's foreign workers . . . pose a threat to national security."  <u>Id</u>. at 7-8.

       The Court rejects each of these three arguments.  The first appears to be based on

the assumption that "border security" is achieved only at the border and nowhere else.  That

assumption makes little sense here.  Thousands of individuals who would have been ineligible to

enter the CNMI under federal immigration law already reside in the CNMI.  Obviously, the

United States could not simply ignore these individuals and at the same time regard the CNMI's

borders as "secure," because one of the principal ways the United States secures its borders is by

requiring compliance with its immigration laws.  But, as the United States recognizes, it would be

rather harsh to secure the CNMI's borders by expelling these individuals immediately.  Thus, the

CNRA takes a third-way approach to border security: it regulates not only those who may seek to enter the CNMI in the future, but also those who already have entered the CNMI and would have had to comply with federal immigration laws upon entry if only they had sought entry at a later date.  In short, the challenged provisions of the CNRA are not unrelated to border security simply because they regulate matters beyond the border.  Rather, they serve the United States' interests in border security in a way that takes into account the peculiar history of the CNMI and the legacy of the CNMI's local immigration regime.

The CNMI's remaining arguments are unpersuasive for two reasons.  First, they assume that the United States has no security interests in the CNMI because it is remote from the mainland of the United States.  But even if is true that the CNMI's remote location makes any events there irrelevant to security on the mainland, the United States nevertheless has an interest in protecting the 30,000 United States citizens residing in the CNMI.

Second, these arguments assume that the CNMI may eliminate the United States' sovereign interests merely by serving those interests itself in the way the CNMI sees fit.  That view is flatly inconsistent with the Covenant.  Just as the CNMI bargained for the provisions reserving to it the right of local self-government, so too did the United States bargain for the provisions granting it ultimate sovereignty, <u>see</u> Covenant § 101; delegating to it complete responsibility for matters relating to foreign affairs and defense, <u>see</u> <u>id</u>. § 104; and permitting it to enact legislation, subject to certain limits, to fulfill its responsibilities in those areas.  <u>See</u> <u>id</u>. § 105.  The United States therefore is entitled to exercise its covenantal rights and discharge its covenantal obligations in any lawful manner, notwithstanding the CNMI's belief that its local policies serve federal interests as well as or better than federal policies.

Finally, the CNMI argues that in evaluating the federal interests at stake the Court may not consider a 2007 Senate Report discussing the CNMI's immigration and labor regimes. See Northern Mariana Islands Covenant Implementation Act, S. Rep. No. 110-324 (April 10, 2008) ("Senate Report").[14]   The CNMI argues that the Court may not consider the Senate Report because (1) the assertions of historical fact in the Senate Report are unsworn hearsay, see CNMI Supp. at 8; and (2) the criticisms of the CNMI's immigration and labor regime recorded in the Senate Report are based on "outdated and unsubstantiated information[.]"  Id. at 9.  The defendants disagree, see, e.g., Defs. Supp. at 8 n.3, but the dispute is irrelevant.  The Court has already concluded, without reference to the Senate Report, that the CNRA serves legitimate federal interests.

### 2.  Degree of Intrusion

Under the Ninth Circuit's balancing test, "[t]he other consideration in [the Court's] analysis is the degree of intrusion into the internal affairs of the CNMI."  United States ex rel. Richards v. De Leon Guerrero, 4 F.3d at 755.  According to the CNMI, the CNRA "mandates an extensive federal intrusion into the CNMI's local affairs," CNMI Supp. at 4, principally by "preempt[ing] local labor laws, inject[ing] the federal government into local labor permitting and

---

[14]    The defendants rely on the Senate Report to show that Congress enacted the CNRA because it had several specific concerns about conditions in the CNMI.  See, e.g., Defs. Supp. at 8-10.  According to the Senate Report, Congress was motivated in part by concerns about (1) the large number of foreign workers in the CNMI; (2) the high rate of unemployment among United States citizens in the CNMI; (3) the possibility that the CNMI's immigration laws were being exploited by international organized crime groups; (4) the increase in the number of children born to foreign workers in the CNMI, and hence the number of United States citizens outside the control of the United States; (5) the difficulty of reconciling the CNMI's immigration policies with the United States' obligations under various international treaties relating to immigration; and (6) evidence of mistreatment of foreign workers in the CNMI.  See Senate Report at *3.

regulation, depriv[ing] the Commonwealth of revenues needed for effective self-government, and subject[ing] foreign workers lawfully admitted to the Commonwealth to deportation[.]"  Mot. Dismiss Opp. at 37.

In Richards, the Ninth Circuit observed that the CNMI wished "to characterize [the] case as one involving unwarranted federal interference with the CNMI's internal fiscal affairs," but that in reality the interests of the CNMI (in privacy and autonomy) and the interests of the United States (in oversight of federal funds) were "inextricably link[ed]" because of the CNMI's reliance on federal financial assistance.  United States ex rel. Richards v. De Leon Guerrero, 4 F.3d at 755.  In other words, the Ninth Circuit concluded that the matters intruded upon were not purely "local" or "internal" in character, and thus that the federal action was not as invasive as the CNMI alleged.  See id. ("In view of the fact that a substantial portion of the CNMI budget is comprised of direct and indirect financial assistance, we cannot say that a federal audit impermissibly intrudes on the internal affairs of the CNMI.").

That same reasoning applies here.  The CNMI wishes to characterize the matters affected by the CNRA as purely "local" or "internal," and hence to portray the CNRA as unjustifiably "intrusive."  In particular, it wishes to characterize the regulation of foreign workers already admitted to the CNMI as a local matter because the CNMI's economy is dependent on the labor of foreign workers.  In addition to being circular, that argument fails to recognize that the presence of thousands of foreign workers in the CNMI, few of whom would qualify to enter the CNMI under federal immigration laws, raises legitimate foreign policy and security concerns – concerns solely within the province of the federal government.  See Amicus Supp. at 2 (acknowledging that the "issue of immigration is deeply and inextricably intertwined with internal social and economic affairs" in the CNMI, but that the issue may also have "defense and

foreign policy implications"). Stated differently, the spheres of authority at issue here – principally, the regulation of foreign worker labor – are not purely local in character because they are shot through with important issues implicating the United States' sovereignty. Thus, any "intrusion" on those spheres of authority by the CNRA must be discounted accordingly. Cf. Sablan v. Superior Court of the Commonwealth of the Northern Mariana Islands, No. 91-0002, 1991 WL 258344, at *4 (N.M.I. July 30, 1991) (concluding, "[i]n light of the Covenant's grant to the United States of authority over foreign affairs and defense in section 104, that section 103 reserved to the people of the Northern Mariana Islands authority over all internal matters in which the inhabitants are substantially interested and which substantially affect them, *so long as those matters do not primarily involve foreign affairs or defense*") (emphasis added).

   Thus, just as the Ninth Circuit in Richards concluded that a federal audit did not impermissibly intrude on the internal affairs of the CNMI, so too does this Court conclude that the CNRA does not impermissibly intrude on the internal affairs of the CNMI. Here, as in Richards, the CNMI has challenged a particular federal action: the application of federal immigration law (and special transitional rules) to the CNMI by way of the CNRA. Like the federal audit at issue in Richards, the CNRA serves identifiable and legitimate federal interests. Indeed, the federal interests at stake here are far weightier than those involved in Richards. Moreover, the CNRA asserts federal authority over few, if any, matters which can be characterized as purely "local"; rather, it incidentally affects some local labor matters to the extent that they are inseparable from immigration matters, which are themselves inseparable from important issues related to foreign affairs and security. No doubt the CNMI would prefer that federal legislation never affect any matters of local concern, no matter how inextricably intertwined they may be with federal affairs. But it cannot rely on the Covenant to ensure that

38

result.  As the Ninth Circuit observed, Sections 103 and 105 "do[] not mean that Congress may not pass any legislation 'affecting' the internal affairs of the CNMI." <u>United States ex rel. Richards v. De Leon Guerrero</u>, 4 F.3d at 755.

## V.  CONCLUSION

For the foregoing reasons, the Court concludes that the CNMI has standing to bring this action and that this matter is ripe for adjudication.  The Court also concludes that Congress was authorized to enact the challenged provisions of the CNRA by the plain and unambiguous terms of Section 503 of the Covenant.  As an alternative, using the Ninth Circuit's balancing test in <u>Richards</u>, the Court concludes that the challenged provisions of the CNRA comply with the mutual consent provision of Section 105 and the "self-government" guarantee of Section 103.  As a result, the Court has granted the defendants' motion to dismiss Counts I and II of the amended complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.  The Court has also denied as moot the CNMI's first motion for a preliminary injunction, the one relating to Counts I and II.  An Order to that effect issued on November 23, 2009.  A separate Opinion and Order relating to Count III will also issue this same day.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  November 25, 2009