UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
COMMONWEALTH OF THE                             )
NORTHERN MARIANA ISLANDS,                       )
                                                )
           Plaintiff,                           )
                                                )
     v.                                         )     Civil Action No. 08-1572 (PLF)
                                                )
UNITED STATES OF AMERICA, *et al.*,             )
                                                )
           Defendants.                          )
_____         )

OPINION

This case arises from a dispute between the Commonwealth of the Northern

Mariana Islands ("the CNMI" or "the Commonwealth") and the United States concerning the

implementation and enforcement of federal legislation that gives the United States government

control over immigration into and out of the Commonwealth.  In a separate Opinion issued

earlier today ("Opinion I"), the Court upheld the authority of the United States government to

enact the challenged statutory provisions.[1]  This Opinion addresses the legality of regulations

recently promulgated by the Department of Homeland Security ("DHS") to enforce the statute in

question.[2]

          The CNMI asks this Court to issue a preliminary injunction barring the

implementation of the regulations because, in its view, DHS violated the Administrative

_____

          [1]     The Court issued the related Order, dismissing Counts I and II of the amended
complaint, on November 23, 2009.

          [2]     In addition to DHS, the defendants are the United States, DHS Secretary Janet
Napolitano, the Department of Labor, and Labor Secretary Hilda Solis.

Procedure Act, 5 U.S.C. § 501 *et seq.*, in promulgating them.  After considering the relevant

filings, the oral arguments presented by counsel for the parties on November 23, 2009, and the

entire record in this case, the Court finds that the CNMI has established its entitlement to a

preliminary injunction.[3]  As a result, the Court will grant the Commonwealth's motion and

enjoin, at least temporarily, the implementation of the regulations.

## I.  BACKGROUND

As explained in greater detail in the first Opinion in this case released earlier

today, the CNMI is a United States territory governed by a mix of federal and local laws.  See

Opinion I at 20-21.  Under the agreement, known as the Covenant, which structures the

relationship between the United States and the CNMI, Congress was authorized to enact

immigration legislation applicable to the CNMI at any time after November 3, 1986, but chose

not to do so until last year — thus permitting the Commonwealth during the interim to retain sole

responsibility for the formulation and enforcement of the Islands' immigration policy.  See First

P.I. Mot. at 3-4.  As a result, the Commonwealth's approach to immigration and the admission of

foreign workers differs significantly from that of the United States.  The CNMI's approach grew

out of its belief that the Islands' population of United States citizens and resident foreign

nationals could not yield a large enough workforce to support the Commonwealth's economy.

---

[3]     The documents considered by the Court on this motion include the following:
CNMI's Supplemental Motion for a Preliminary Injunction ("Mot."); the United States'
Opposition to the Plaintiff's Supplemental Motion for a Preliminary Injunction ("Opp."); the
CNMI's reply to that opposition ("Reply"); CNMI's Motion for a Preliminary Injunction ("First
P.I. Mot."); Declaration of Jacinta Kaipat (filed as an attachment to First P.I. Mot.) ("Kaipat
Decl."); Defendants' Opposition to the Motion for a Preliminary Injunction ("First P.I. Opp.");
and the CNMI's reply to that opposition ("First P.I. Reply").

To address that problem, the CNMI's government has actively encouraged foreign workers to travel to and take employment within the Commonwealth, id. at 3, and permitted the entry of numerous foreign workers who would not be eligible to enter the United States under federal immigration law. See Kaipat Decl. ¶ 55.

In 2008, concerned about "the need to ensure uniform adherence to long-standing fundamental immigration policies of the United States," Congress passed and President Bush signed the Consolidated Natural Resources Act ("the CNRA"), which, among other things, provides that the immigration laws of the United States will displace those of the CNMI starting on November 28, 2009. See Pub. L. No. 110-229, sec. 702(a), § 6(a)(1), 122 Stat. 754, 854-55 (2008).[4]  To minimize the disruption that could result from the Commonwealth's shift to a new immigration policy, the statute establishes a "transition period" that will commence on November 28, 2009, and end no less than five years after that date. Id. § 6(a)(2).  Any individual who is lawfully present in the CNMI pursuant to the Commonwealth's immigration laws at the start of that transition period may remain within the Islands for a grace period that ends on the earlier of (1) the date when that person's right to entry would have expired under Commonwealth law, or (2) November 28, 2011. Id. § 6(e)(1)(A).  A foreign worker who wishes to enter the Commonwealth after November 28, 2009, or who is already present in the CNMI but is nearing the end of her grace period, must follow one of two protocols in order to enter or remain in the

---

[4]      The statutory provisions in question become effective "on the first day of the first full month commencing 1 year after the date of enactment of" the CNRA.  CNRA sec. 702(a), § 6(a)(1).  The original effective date authorized by the statute was June 1, 2009.  See Commonwealth of the Northern Mariana Islands Transitional Worker Classification, 74 Fed. Reg. 55,094, 55,094 (Oct. 27, 2009).  Exercising the authority granted her by the statute, the Secretary of DHS postponed the effective date by 180 days, to November 28, 2009.  Id.

Islands lawfully: either she must obtain a visa or other authorization under the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, or she must obtain a permit issued as part of the "transition program" mandated by the CNRA.  Id. § 6(d)(2).

The CNRA transition program provides a means for foreign workers who are not eligible to enter or remain in the Commonwealth under the terms of the INA to work in the Islands lawfully during the transition period.  Under the program, the Secretary of DHS is authorized to issue a permit to "prospective employers for each" foreign worker "who would not otherwise be eligible for admission under the" INA.  CNRA sec. 702(a), § 6(d)(2).  The Secretary generally has broad discretion to decide how many permits will be issued and in what manner they will be allocated, but the CNRA requires that the number of permits granted annually must gradually be reduced to zero by the end of the transition period.  Id.

The CNRA was enacted on May 8, 2008.  Opp. at 4.  On October 27, 2009, without first providing notice and the opportunity for public comment, DHS released an interim rule entitled "Commonwealth of the Northern Mariana Islands Transitional Worker Classification" ("the Interim Permit Rule").  See 74 Fed. Reg. 55,094 (Oct. 27, 2009).  Intended to structure and govern the transition program for foreign workers that begins on November 28, 2009, the interim rule defines the types of businesses that will be eligible to receive permits for foreign workers, sets a numerical limit on the number of permits that will be granted between November 28, 2009, and September 30, 2010, and delineates requirements that must be met by any employer seeking to obtain a permit.  See id. at 55,109-10.  Although the notice of the interim rule published in the *Federal Register* invites comments about the regulations and promises that they will be considered during the formulation of a final rule, DHS acknowledged

in the same notice that the interim rule will become effective in its current form on November 27, 2009, id. at 55,094 — meaning that the interim rule will take effect without being revised to account for any comments made by members of the public after the rule's publication on October 27. Id. at 55,101.[5]

On September 12, 2008, the Commonwealth filed the instant action, seeking, among other things, to permanently enjoin the implementation of certain provisions of the CNRA, including Section 702(a). See First PI Mot. at 1. At the same time, it filed a motion for a preliminary injunction that would bar those provisions from taking effect prior to the conclusion of this litigation. The defendants filed a motion to dismiss, and the Court heard argument on that motion and on the first motion for a preliminary injunction. While those motions were pending, DHS issued the Interim Permit Rule. On November 2, 2009, the Commonwealth filed an amended complaint, adding an Administrative Procedure Act claim, and moved for a second preliminary injunction, one that would suspend the operation of the Interim Permit Rule until this Court has issued a final ruling on its legality. See Mot. at 17. The Commonwealth argues that the interim rule was promulgated in violation of the APA because DHS wrongfully dispensed with the notice-and-comment procedures required by the statute.

---

[5]     Throughout its filings and at oral argument, the defendants represented to the Court that the Interim Permit Rule becomes effective at 12:01 a.m. on November 28, 2009. In a subsequent call to Chambers, counsel for the parties advised the Court that this means 12:01 a.m. Chamorro Standard Time (the CNMI's time zone), which is 9:01 a.m. on November 27, 2009, in Eastern Standard Time.

## II. DISCUSSION

In deciding whether to grant emergency injunctive relief, the Court must consider (1) whether there is a substantial likelihood that plaintiffs will succeed on the merits of their claim, (2) whether plaintiffs will suffer irreparable injury in the absence of an injunction, (3) the harm to defendants or other interested parties (balance of harms), and (4) whether an injunction would be in the public interest or at least not be adverse to the public interest. See Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291 (D.C. Cir. 2009); Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

Plaintiffs are not required to prevail on each of these factors. Rather, these factors must be viewed as a continuum, with more of one factor compensating for less of another. Davis v. Pension Benefit Guar. Corp., 571 F.3d at 1291-92. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir.1995). An injunction may be justified "where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury." Id. Conversely, when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a "substantial" case on the merits. The necessary level or degree of likelihood of success that must be shown will vary according to the Court's assessment of other factors. Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843-45 (D.C. Cir. 1977). In sum, an injunction may be issued "with either a high probability of success and some injury, or vice versa." Cuomo v. U.S. Nuclear Regulatory Comm'n, 772 F.2d 972, 974 (D.C. Cir. 1985).

6

*A.  Success on the Merits*

Before promulgating a new rule, federal agencies generally are required by the Administrative Procedure Act to give interested parties notice of the proposed rule's content and "an opportunity to participate in the rule making through submission of written data, views, or arguments."  5 U.S.C. §§ 553(b)-(c).  Here, DHS first provided public notice of the Interim Permit Rule when it published the rule in the *Federal Register* on October 27, 2009.  Since the interim rule was already in its final form on that date, it is undisputed that DHS failed to provide the notice and opportunity for comment typically required by the APA.  See 74 Fed. Reg. at 55,100-01.

According to the defendants, the agency's failure to engage in notice-and-comment rulemaking procedures does not violate the APA because DHS had "good cause" for the omission.  See Opp. at 2; 74 Fed. Reg. at 55,100-01.  An agency is authorized to dispense with notice-and-comment procedures when it "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(B).  DHS invoked this exception when it published the Interim Permit Rule in this case, stating in the *Federal Register* that the agency would not provide prepromulgation notice and opportunity for comment because (1) Congress provided the agency only "a relatively short timeframe" in which to finalize the regulations; (2) in that timeframe, DHS had to "conduct a thorough review of the CNMI's immigration system," "develop a complex regulatory scheme," and consult "with the CNMI government, Departments of State and Interior and other required stakeholders"; and (3) "the failure to have an effective interim regulation in place by" November 28, 2009 "would serve only to harm the CNMI and aliens residing" there.  74 Fed. Reg.

7

55,100-01.  Defendants reiterate those points in response to the CNMI's motion for a preliminary injunction.  <u>See</u> Opp. at 18-22.

The parties agree that "[a]s an elementary principle, it is clear that exceptions to section 553 notice-and-comment procedures are to be narrowly construed and only reluctantly countenanced."  <u>Petry v. Block</u>, 737 F.2d 1193, 1200 (D.C. Cir. 1984) (citation and internal quotation marks omitted).  Those exceptions "are not escape clauses that may be arbitrarily utilized at the agency's whim"; they are desperate measures whose use "should be limited to emergency situations."  <u>Id</u>. (citing <u>American Fed'n of Gov't Employees v. Block</u>, 655 F.2d 1153, 1156 (D.C. Cir. 1981)) (internal quotation marks omitted).  In deciding whether such an "emergency situation[]" justifies an agency's failure to comply with the APA's standard notice-and-comment requirements, a court "analyze[s] the entire set of circumstances surrounding the agency rulemaking."  <u>Universal Health Servs. of McAllen, Inc. v. Sullivan</u>, 770 F. Supp. 704, 720 (D.D.C. 1991) (citing <u>Petry v. Block</u>, 737 F.2d at 1203) (internal quotation marks omitted).  Relevant circumstances may include the scale and complexity of the regulatory program the agency was required to implement, <u>see</u>, <u>e.g.</u>, <u>Petry v. Block</u>, 737 F.2d at 1200; any deadlines for rulemaking imposed by the enabling statute, <u>see</u>, <u>e.g.</u>, <u>id</u>. at 1201; the diligence with which the agency approached the rulemaking process, <u>see</u>, <u>e.g.</u>, <u>Council of the S. Mountains, Inc. v. Donovan</u>, 653 F.2d 573, 581 (D.C. Cir. 1981); obstacles outside the agency's control that impeded efficient completion of the rulemaking process, <u>see</u>, <u>e.g.</u>, <u>id</u>. at 581; and the harm that could befall members of the public as a result of delays in promulgating the rule in question, <u>see</u>, <u>e.g.</u>, <u>Woods Psychiatric Institute v. United States</u>, 20 Cl. Ct. 324, 332 (1990).

8

Upon consideration of the totality of the circumstances that surrounded DHS'
promulgation of the Interim Permit Rule, the Court concludes that the plaintiff is likely to
succeed on its claim that the agency did not have "good cause" to dispense with notice-and-
comment procedures and thus violated the APA.  Defendants suggest that providing notice and
an opportunity to comment prior to promulgating the rule was impracticable because Congress,
in passing the CNRA, imposed several burdensome administrative duties on DHS and only
allowed the agency eighteen months in which to fulfill them.  See Opp. at 19-21.  This argument
is unpersuasive.  In the context of the various cases addressing the APA's notice-and-comment
provisions, eighteen months is a lengthy period of time.  The courts have found good cause
where an agency was given, for example, only forty-nine days, see Philadelphia Citizens in
Action v. Schweiker, 869 F.2d 877, 880 (3d Cir. 1982), or five months, see Petry v. Block, 737
F.2d at 1195-96, to implement the terms of a statute.  But defendants have cited no case
analogous to this one in which an agency had eighteen months to issue a rule and still was found
to have good cause to omit notice-and-comment procedures.

In the only case cited by the defendants in which an agency was found to have
good cause despite an eighteen-month implementation period, factors not present here motivated
the court's decision.  In that case, as here, the defendant agency was forced by statutory deadlines
to promulgate new regulations within eighteen months after the passage of the enabling
legislation.  See Nat'l Women, Infants, and Children Grocers Ass'n v. Food & Nutrition Serv.,
416 F. Supp. 2d 92, 106 (D.D.C. 2006).  But in that case, unlike this one, the court noted that the
enabling legislation explicitly permitted the agency to issue an interim rule, thereby conferring
upon the agency "some discretion" to promulgate a preliminary rule "without first providing

notice and comment." Id. at 105.  Furthermore, in that case the agency supported its argument

that it had good cause for omitting notice-and-comment procedures with detailed evidence

demonstrating that it had "worked diligently to meet the congressionally-imposed deadline."  Id.

at 104.

   Neither of those factors is present in this case.  The CNRA provides for no

departures from the procedures mandated by the APA, and DHS has not attempted to present any

evidence indicating that the agency "worked diligently" to complete the Interim Permit Rule

beginning in May 2008, when the CNRA was enacted.  If DHS wished to present a more credible

argument that meeting its responsibilities under the CNRA prevented it from engaging in notice-

and-comment procedures, it could have, as other defendant agencies have done, provided the

Court with detailed evidence demonstrating that the agency has spent the last eighteen months

striving to complete CNRA implementation as efficiently as possible.  See, e.g., Council of the S.

Mountains, Inc. v. Donovan, 653 F.2d at 581; Petry v. Block, 737 F.2d at 1201.  It has provided

no such evidence and has not suggested that such evidence is forthcoming.[6]

   Defendants suggest that eighteen months should be considered "a relatively short

time" because the CNRA required DHS to analyze large amounts of data and design "an entirely

new nonresident worker classification system" that would advance the policy goals specified by

Congress.  Opp. at 20.  That argument might be persuasive if Congress had provided only four or

five months, see Petry v. Block, 737 F.2d at 1195-96, but with an eighteen-month window, the

fact that DHS was burdened with the task of creating a new program that required extensive

---

   [6]  For the same reasons, the Court is unpersuaded by the defendants' argument that
DHS had to issue multiple rules to implement the CNRA and therefore lacked time to engage in
notice-and-comment rulemaking with regard to the Interim Permit Rule.  See Opp. at 20-21.

planning, or that the agency was given multiple responsibilities by the same statute, cannot be considered sufficient cause to jettison the APA's notice-and-comment procedures.  If it were, the exceptions to Section 553's notice-and-comment provisions might swallow the rule, as every agency obligated to develop a new federal program in a finite amount of time could decide that it had good cause to dispense with public participation in rulemaking.

In addition to their argument that notice-and-comment procedures were impracticable, defendants assert that good cause exists here because, if DHS had taken the time to allow notice and an opportunity for comment, the promulgation of the Rule would have been delayed, and "nonresident workers, [their dependents], and businesses in the CNMI" would have "face[d] potential harm."  Opp. at 22.  If the Rule were not promulgated by November 28, 2009, they argue, the CNRA would take effect on that date anyway, and "the failure to have an effective interim regulation in place . . . would serve only to harm the CNMI."  74 Fed. Reg. at 55,101.  This argument begs the question.  As explained above, DHS has failed to demonstrate that it could not, with due diligence, have completed a draft version of the interim rule, engaged in notice-and-comment procedures, and finalized the rule before the statutory deadline.

Furthermore, the type of harm alleged to create good cause here — a statute's becoming effective without implementing regulations in place — is materially different from the prospective harms found to justify omission of notice-and-comment procedures in other situations.  If the mere possibility that an enabling statute would go into effect without accompanying administrative rules were sufficient to justify an agency's departure from typical APA procedures, then an agency could evade its procedural obligations simply by waiting until the statute's effective date is near, releasing a final version of the implementing regulations, and

11

claiming that, because harm would result if the final regulations were not in place, good cause existed.  Courts have repeatedly rejected this scenario, refusing to permit "an agency . . . [to] simply wait until the eve of a statutory . . . deadline, then raise up the 'good cause' banner without following APA procedures."  Council of the S. Mountains, Inc. v. Donovan, 653 F.2d at 581.  Where harm to the public interest has been found to constitute good cause, that harm has resulted, not from the advent of a statutory deadline of which the agency was aware well in advance, but rather from the development of unexpected problems that demanded swift resolution by agency action.  See, e.g.,Nat'l Fed'n of Fed. Employees v. Nat'l Treasury Employees Union, 671 F.2d 607, 611 (D.C. Cir. 1982) (agency was forced into action to prevent harm that might result from "events and circumstances beyond [the agency's] control, which were not foreseen in time to comply with notice and comment procedures"); Woods Psychiatric Institute v. United States, 20 Cl. Ct. at 332 (good cause found where confusion over the operation of an agency program was leading to the filing of lawsuits, and clarifying regulations were thus required as soon as possible).

In light of these considerations, the Court thinks it likely that the CNMI will succeed on its claim that defendants violated the APA by forgoing the required notice-and-comment procedures without good cause.  Of course, this is not a final determination; it may be that, with more time to gather evidence and to prepare briefs and affidavits, the defendants will be able to make a more persuasive argument that notice-and-comment procedures were impracticable.  But at this juncture, the CNMI has demonstrated a substantial likelihood of success on the merits of its APA claim.

*B.  Irreparable Harm*

A party experiences actionable harm when "depriv[ed] of a procedural protection to which he is entitled" under the APA.  Sugar Cane Growers Cooperative of Florida v. Veneman, 289 F.3d 89, 94-95 (D.C. Cir. 2002).  If such were not the case, "section 553 would be a dead letter." Id. at 95.  If defendants have in fact violated the APA's notice-and-comment provisions, then, there is no question that the CNMI will be injured by the implementation of the Interim Permit Rule.  But to justify the issuance of a preliminary injunction, the CNMI must show that unless the rule is enjoined, the Commonwealth is likely to experience not just some injury, but irreparable harm that cannot be cured by ultimate success on the merits in this case. See Wisc. Gas Co. v. Fed. Energy Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985).  "Further, the [CNMI] must show that the alleged harm will directly result from the action which [the CNMI] seeks to enjoin." Id.  The Court concludes that the Commonwealth has made the necessary showing.

The notice-and-comment provisions of the APA

are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review.

Environmental Integrity Project v. EPA, 425 F.3d 992, 996 (D.C. Cir. 2005).  Such concerns about "fairness to affected parties" and the "exposure" of proposed regulations "to diverse public comment" are especially warranted where the rule in question creates a complex and far-reaching regulatory regime.  See Council of the S. Mountains, Inc. v. Donovan, 653 F.2d at 582 ("[T]he more expansive the regulatory reach of (agency) rules, . . . the greater the necessity for public

13

comment" (citation and internal quotation marks omitted)).  The Interim Permit Rule challenged

here will dramatically alter the Commonwealth's current system for admitting nonresident

guestworkers, who constitute two-thirds of the CNMI's private workforce.  See First PI Mot. at

3.  It sets a hard numerical cap on the number of foreign workers, not otherwise eligible for entry

under the INA, that may be licensed by the federal government to take employment in the

Commonwealth through 2010.  See 74 Fed. Reg. at 55, 098.  It sets the conditions under which

individuals or entities will be allowed to obtain permits to employ new guest workers.  See id. at

55,096-97.  It puts few limits upon the discretion of the Secretary of DHS to determine which

employers will receive those permits.  See id. at 55,097.  In short, the Rule will enact far-

reaching changes that likely will have significant effects on the CNMI labor market, and it will

do so despite the fact that it has not "been tested via exposure to diverse public comment."

Environmental Integrity Project v. EPA, 425 F.3d at 996.

       The CNMI argues convincingly that the Commonwealth's residents and

government have meaningful concerns about the Rule.  For example, the CNMI suggests that the

criteria established by the Rule for issuance of permits for new guest workers to employers may

be inadequate.  See Reply at 12-13.  As written, the Rule requires employers seeking permits to

"[c]onsider all available United States workers for the position[]" to be filled by a new guest

worker, but does not require those employers to consider guest workers already present in the

Commonwealth for the position.  See 74 Fed. Reg. at 55,110; Reply at 13.  To ensure that

employers have "consider[ed] available United States workers," the Rule asks only that

employers attest that they have done so, 74 Fed. Reg. at 55,110; the CNMI posits that such

attestations may "be prone to fraud and [] leave qualified U.S. citizens unemployed," a matter it

would have raised and documented if it had been given the opportunity to comment.  Reply at 13.

These and similar concerns support the conclusion suggested by the size and novelty of the

program instituted by the Interim Permit Rule: DHS should have complied with the APA's

notice-and-comment provisions before promulgating the Rule, and its failure to do so impaired

the CNMI's ability to protect its interests.[7]

Furthermore, if the Court ultimately decides the merits of the plaintiff's APA

claim in the Commonwealth's favor, the damage done by DHS' violation of the APA cannot be

fully cured by later remedial action.  Once the program structured by the Rule has begun

operation as scheduled on November 28, 2009, DHS is far less likely to be receptive to

comments.  As the D.C. Circuit has pointed out, "Section 553 is designed to ensure that affected

parties have an opportunity to participate in and influence agency decision making at an early

stage, when the agency is more likely to give real consideration to alternative ideas." New Jersey

v. EPA, 626 F.2d 1038, 1049 (D.C. Cir. 1980) (citation and internal quotation marks omitted).

And the APA requires that comments submitted by members of the public be *considered* (not

simply received) by the agency.  "[P]ermitting the submission of views after the effective date of

a regulation is no substitute for the right of interested persons to make their views known to the

agency in time to influence the rule making process in a meaningful way." American Fed'n of

_____

[7]     Defendants' counsel spent a considerable amount of time at oral argument explaining why any comments that the CNMI proposes to offer on the regulations in question will neither assist DHS nor result in any improvements to the Interim Permit Rule.  See Transcript of Oral Argument (Nov. 23, 2009) (page numbers not available as of the date of this Opinion).  The CNMI, however, is not required to show that its comments would have affected the final form of the Rule.  See Sugar Cane Growers Cooperative of Florida v. Veneman, 289 F.3d at 94 ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered.").

15

Gov't Employees v. Block, 655 F.2d at 1158.  If the Interim Permit Rule is not enjoined prior to

its effective date, the CNMI will never have an equivalent opportunity to influence the Rule's

contents.

    It is true, as the defendants argue, that the injury alleged by the CNMI is not so

great as others that have justified the issuance of preliminary injunctions in comparable

situations.  See, e.g., Nat'l Ass'n of Farmworkers Orgs. v. Marshall, 628 F.2d 604, 613-14 (D.C.

Cir. 1980) (exposure of children to possibly dangerous pesticides constitutes irreparable harm).[8]

But the injury is "actual" and "great," see Wisc. Gas Co. v. Fed'l Energy Regulatory Comm'n,

758 F.2d at 674, and it is sufficient to weigh in favor of the issuance of an injunction.   Contrary

to the defendants' protestations, the Court's conclusion that the CNMI has suffered irreparable

injury does not mean that "every litigant challenging an agency's failure to abide by the notice

and comment provisions of § 553 of the APA [can] obtain a preliminary injunction against the

challenged regulation."  See Opp. at 10.  After all, irreparable injury is but one of four factors

courts consider in deciding whether to issue a preliminary injunction.  In the context of this

particular case, where the likelihood of success on the merits is so high and the public interest

served by an injunction is so great, see infra at 20-22, the CNMI has shown injury serious enough

to warrant immediate injunctive relief.  See CityFed Fin. Corp. v. Office of Thrift Supervision,

58 F.3d at 747.

---

  [8]  Defendants also rely heavily upon a recent decision issued from Judge Urbina,
United Farmworkers v. Chao, Civil Action No. 09-0062 (D.D.C. Jan. 15, 2009) (order denying
preliminary injunction), for the proposition that the CNMI has failed to plead a sufficient injury
to justify issuance of a preliminary injunction.  Since United Farmworkers was not brought
pursuant to Section 553 of the APA, however, and since the plaintiffs in that case did not allege
violation of a procedural right as an injury, see id. at 2-3, that case is inapposite.

### C.  Balance of Harms

The defendants do not claim that they will be significantly prejudiced if the requested preliminary injunction is granted.  See Opp. at 13-17.  Instead, they argue that nonparties to this action will be harmed if the CNRA goes into effect on November 28, 2009, unaccompanied by the regulations put in place by the Interim Permit Rule.  Under the CNRA, regardless of whether the Interim Permit Rule is in effect, individuals lawfully present in the CNMI on November 28 may not be deported for failing to comply with the terms of the INA, and they may retain any authorization to work that they received under CNMI law.  See CNRA, sec. 702(a), § 6(e).  The statute provides no explicit protection, however, for lawful CNMI guest workers who leave the Commonwealth after November 28, 2009, and then seek to re-enter, nor does it create a means for CNMI employers to seek permits for new guest workers.  The statute does not address re-entry by lawful guest workers, and the implementation of a system that would allow employers to hire foreign workers from outside the CNMI was left to the Executive Branch.  See id. § 6(a)(5) (instructing the Departments of Labor, State, Interior, and Homeland Security to implement measures addressing "procedures to ensure that Commonwealth employers have access to adequate labor").  As a result, the defendants argue that Commonwealth guest workers and employers wishing to hire new foreign workers from outside the CNMI will be left in the lurch if this Court enjoins timely implementation of the Interim Permit Rule.  See Opp. at 16-17.

While these are significant concerns, the possible difficulties identified by the defendants do not persuade the Court that the residents of the CNMI will be better off if an injunction does not issue.  First, the potential harms cited by the defendants are entirely

speculative.  The defendants here have provided no evidence tending to show how many workers

and businesses, if any, will be affected by a temporary delay in the implementation of the Interim

Permit Rule, and the Court is aware of none.  As an initial matter, the parties — and the Court —

can only speculate as to when foreign workers currently present in the Commonwealth will be

able to leave the CNMI with any confidence that they will be readmitted, even after the Interim

Permit Rule goes into effect.  Under the transition program as structured by the Interim Permit

Rule, to leave the Commonwealth and return legally, a foreign worker admitted to the CNMI

prior to November 28, 2009, and otherwise ineligible to be present in the United States under the

INA must acquire a permit issued by DHS.  See 74 Fed. Reg. at 55,111.  To get that permit, the

worker must convince his or her employer to petition for it.  Id. at 55,109.  The employer must

then compile evidence demonstrating that it "meets the definition of eligible employer" pursuant

to the Interim Permit Rule, complete the necessary paperwork, and submit the petition package to

DHS, along with an annual fee of $150.  Id. at 55,110.  DHS must approve the permit.  Then,

after the worker's permit has been approved and the worker has left the CNMI, he or she must

obtain a visa from a consulate before attempting to return to the Commonwealth.  Opp. at 16.

There is currently no way of knowing how long that permitting process will take, or how easily a

worker traveling with a permit may obtain a visa.  Transcript of Oral Argument (Nov. 23, 2009).

In other words, it is unclear that foreign workers otherwise ineligible under the INA will be able

to leave the CNMI and re-enter it within the first several weeks after November 28, 2009, even if

the Interim Permit Rule is in place.

   Similarly, while the Interim Permit Rule creates a mechanism whereby a CNMI

employer may arrange to hire foreign workers from outside the Commonwealth, it is difficult to

18

know whether employers will have much need for that mechanism in the weeks immediately

following November 28, 2009.  The CNMI maintains that the Commonwealth's guest worker

population currently is experiencing high rates of unemployment, and that employers are

consequently unlikely to require permits for new guest workers in the near future.  Reply at

20-21.  Consequently, the United States cannot argue with any degree of certainty that CNMI

employers will be harmed by the issuance of a preliminary injunction in this matter.

   Ultimately, however, whatever the actual scale of the potential difficulties cited by

the defendants, those difficulties may be addressed by DHS without recourse to the full

transitional program to be enacted by the Interim Permit Rule.  To assist either foreign workers

seeking to leave and return to the CNMI or employers desperately in need of workers from

outside the Commonwealth, DHS may, if necessary, promulgate a narrowly focused and

temporary emergency regulation that addresses only the problem at hand.  Such targeted

emergency rules may be promulgated without notice and comment, since they legitimately fall

within the APA's "good cause" exception.  See, e.g., American Federation of Gov't Employees

v. Block, 655 F.2d 1153, 1154-55 (D.C. Cir. 1981) ("promulgation of emergency regulations by

the Department was a reasonable and perhaps inevitable response to" an injunctive court order

that required almost immediate changes in the relevant regulatory program).[9]

   In promulgating such emergency regulations, DHS would, in fact, be taking the

action that it should have taken in the first place if the agency truly was unable to issue a full set

of implementing regulations for the CNRA prior to late October 2009:  It would be issuing a

---

[9]   The Commonwealth has also represented to the Court that it would not object to
such a narrowly tailored emergency regulation if one proved to be necessary in the wake of an
injunction.

short-term rule that would address only immediate problems created by the advent of the statute's

effective date, while waiting to issue a more comprehensive rule until it could provide the public

with notice and an opportunity for comment.  This is the procedure most consistent with the

letter and the spirit of the APA.  <u>See</u>, <u>e.g.</u>, <u>Council of the S. Mountains v. Donovan</u>, 653 F.2d at

582 (dispensing with notice and comment is more acceptable when the agency action in question

is of "limited scope"); <u>American Fed'n of Gov't Employees v. Block</u>, 655 F.2d at 1157 & n.7

(omitting notice and comment is more easily justified where regulations do not address more

than "the exigencies of the moment").

It is unfortunate that DHS may have to issue such ad hoc, emergency rules.  The

Court emphasizes, however, that this is a problem of the agency's own making. Had the agency

released the Interim Permit Rule earlier in the year and provided the public with notice and an

opportunity for comment, the current quandary never would have arisen.  DHS should not now

expect to excuse its violation of the APA by pointing to the problems created by its own delay.

### D.  The Public Interest

The public interest is served when administrative agencies comply with their

obligations under the APA.  <u>See</u> <u>New Jersey v. EPA</u>, 626 F.2d at 1045 ("It is now a

commonplace that notice-and-comment rule-making is a primary method of assuring that an

agency's decisions will be informed and responsive."); <u>Creosote Council v. Johnson</u>, 555 F.

Supp. 2d 36, 40 (D.D.C. 2008) (there is a "general public interest in open and accountable

agency decision-making").

Besides the general public interest served by agencies' compliance with the law, more specific interests unique to this case will be best served if DHS is compelled to submit the Interim Permit Rule to notice and comment before it goes into effect.  The relationship between the United States and the CNMI is a contractual one, cemented by a governing document, the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("the Covenant").  See Pub. L. No. 94-241 (adopting the Covenant); see generally Opinion I at 20-21.  Although the United States is sovereign over the CNMI pursuant to that agreement, see Covenant § 101, both the United States and the Mariana Islands, at the time of forming the Covenant, agreed that the CNMI should have some control over its own fate.  See Covenant § 103 (providing that the Commonwealth retains "the right of local self-government and will govern [itself] with respect to internal affairs in accordance with a Constitution of [its] own adoption"); id. § 105 (the United States must "respect th[at] right of self-government").  Since the CNMI has no voting representation in Congress, see CNRA, sec. 711, and its rights must be enforced in United States courts, see Covenant § 903, the preservation of those rights depends to a great extent on the willingness of the United States to exercise self-restraint and to respect both the letter and the spirit of the Covenant.

Perhaps in recognition of this reality, Congress required the Secretary of DHS, "[i]n adopting and enforcing" the transitional permit program authorized by the CNRA, to "consider, in good faith and not later than 30 days after receipt by the Secretary, any comments and advice submitted by the Governor of the Commonwealth."  CNRA, sec. 702(a), § 6(d)(2).  If anything, this directive would seem to require, or at least advise, DHS to engage in additional procedures, over and above those mandated as a matter of course by the APA, to ensure that the

CNMI participates actively in the rulemaking process.  By failing to meet even the minimum standards set by the APA, DHS has also failed to comply fully with Congress' intent to secure the meaningful involvement of the Commonwealth in the transformation of the CNMI's immigration program.  DHS has also, if only inadvertently, indicated to the CNMI that the Commonwealth may have little or no role in determining the parameters of a "transitional" program that may last long after 2014.  See CNRA, sec. 702(a), § 6(d)(5)(A) (authorizing the Secretary of Labor to extend the length of the transition period by up to five years an unlimited number of times).  That program is of great importance to the CNMI, since it has the potential to transform the nature of the Commonwealth's workforce.  See Opinion I at 5-6.  That program also involves an area — the regulation of immigration into the CNMI — about which the Commonwealth has significant expertise, having knowledge of the needs of its own economy and having operated its own immigration program for decades.  In light of all of these factors, the public interest will be best served if the Interim Permit Rule is temporarily enjoined so that it may be revised as necessary by DHS upon receipt of comments and advice from the CNMI and any other interested parties.

### III.  CONCLUSION

For the foregoing reasons, the CNMI's supplemental motion for a preliminary injunction is GRANTED.  An Order consistent with this Opinion shall issue this same day.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  November 25, 2009